O

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FISHER SCIENTIFIC INTERNATIONAL, INC. and FISHER SCIENTIFIC COMPANY, L.L.C., | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-03-467 |
| IVAN MODROVICH and HUNNAVIX KFT, | § § § | |
| Defendants. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Preliminary Statement

All issues in this lawsuit have previously been decided in the Court's Memoranda and Orders entered September 8, 2003, December 18, 2003, and September 1, 2004, except for (i) Ivan Modrovich's claim that Fisher Scientific International, Inc. and/or Fisher Scientific Company, L.L.C. ("Fisher"), interfered with a contract, to wit, a Consulting Agreement between Medical Analysis Systems, Inc. and Modrovich, and (ii) Fisher's claim against Modrovich for an award of attorneys' fees.  The parties agreed to submit to the Court on affidavits the attorneys' fees dispute after the contract interference claim was adjudicated at trial.

The case went to trial on the tortious interference with contract claim on July 20, 2005, and concluded on July 25, 2005.

After all parties rested and closed the evidence, the Court heard and considered the arguments and authorities of counsel, and now makes the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52.

## Findings of Fact

**From a preponderance of the evidence, the Court finds as follows:**

### Background for Fisher's Investment in MAS

1.   In 1974, Plaintiff Ivan Modrovich ("Modrovich"), a talented chemist and inventor, founded Medical Analysis Systems, Inc. ("MAS") to develop and market reagents that he had developed, which are used in diagnostic blood testing, and control products applied to assure the accuracy of results reported by laboratories.

2.   MAS sold its products through distributors and, in 1982, entered into an exclusive distribution agreement with CMS, which was later acquired by Fisher.

3.   MAS's business grew over the years, with annual sales rising from $2.4 million in 1985 to $23 million in 1998.

4.   The exclusive distribution agreement between MAS and Fisher entitled Fisher to purchase MAS's manufactured control products at MAS's manufacturing costs.  Fisher then would re-sell these control products to clinical laboratories and, pursuant to

2

the distribution agreement, Fisher would then split the profits
with MAS.

5.    In September, 1998, MAS acquired certain assets and
liabilities of the diagnostic quality control business line of Dade
Behring, Inc. ("Dade").  Dade had a distribution agreement with
Allegiance Healthcare ("Allegiance") as its distributor.  MAS,
under Modrovich's direction, then began using two distributors,
Fisher and Allegiance.  The Dade acquisition and issues arising
therefrom contributed to new business difficulties at MAS.
Although sales spiked up in 1999 and 2000 after Dade was acquired,
MAS began to encounter a severe cashflow problem.

6.    In 1999, Fisher sued MAS claiming, among other things,
that under Modrovich's leadership and at his direction, MAS had
over the years defrauded Fisher by overcharging for the products
and falsely inflating its manufacturing costs.  Fisher contended
that Modrovich personally benefitted from the alleged overcharges
because he received 15% of MAS's gross revenues as a royalty for
licensing intellectual property to MAS.

7.    Substantial litigation costs further escalated the
severity of MAS's cashflow problem in 1999 and 2000.  By August,
2000, in Modrovich's words, MAS's cashflow problem was "choking the
company," and MAS was in dire need of a large cash infusion.

8.    In March 2001, MAS, Modrovich, and Fisher settled the
Fisher lawsuit under terms requiring Fisher International to invest

in and lend to MAS a total of $20 million, for which Fisher received 45% of MAS's capital stock, a promissory note, a future adjustment in its equity investment if MAS failed to attain certain earnings, and the right to appoint three of the five members of MAS's Board of Directors.

9.    The newly established Board of Directors of MAS held its first meeting on March 29, 2001.  The Board members were Modrovich, who was chairman, and his designee, E. G. Slautterback, and three directors designated by Fisher, Paul Meister, David DellaPenta, and Todd DuChene.  At this meeting presentations were made by MAS's Executive Management Team, which included MAS's senior vice president for sales and marketing, the vice president for operations, the vice president for quality/regulatory affairs, the director of product technical support, and the financial officer. The reports were uniformly negative and identified serious problems in sales, marketing, delivery of products, lack of working capital to purchase raw materials, and other manufacturing problems, non-compliance issues regarding regulatory and legal requirements, and vendor problems including the diversion of substantial resources simply to manage accounts payable.

10.    Notwithstanding the $20 million cash infusion that Fisher had made in the company, it became evident to Fisher's designated directors that the cashflow and other operational problems at MAS

were much more severe than had been anticipated when Fisher did its due diligence investigation prior to making its initial investment.

11.   On April 4, 2001, a special meeting of the MAS Board of Directors was held, primarily to consider the cashflow problems and the pressing need for another cash infusion of $5 million, and to consider Modrovich's presentations on the subject.   Modrovich's proposal was rejected by the MAS Management Team and ultimately by the MAS Board as inadequate and because it would violate various agreements MAS had undertaken. Instead, the MAS board agreed, by a three-two vote, to make a new equity offering for $5 million, in which Modrovich and other shareholders would be entitled to participate pro rata and Modrovich could thereby retain his majority ownership of the company.   Three weeks later, at the next MAS Board meeting, the offering price per share was set for the MAS capital stock to be issued to raise the needed $5 million.

12.   Fisher promptly funded its 45% share of the new $5 million stock offering.   An additional 45 days were allowed for Modrovich and other shareholders to participate in the offering, but none did.   Fisher therefore funded the entire $5 million offering, which increased its share holdings to approximately 70% of MAS's outstanding shares.

13.   During the same month of April, 2001, all of the top Management Team of MAS jointly signed a letter addressed to the MAS Board of Directors, including Modrovich, thanking the Board for

addressing the operating concerns of MAS but stating that the Management Team could no longer effectively serve MAS because of the conflict of interest between the Management Team and Modrovich. The Management Team reported that the "erratic behavior of Mr. Modrovich makes the work environment at MAS intolerable," complained that under Modrovich's leadership MAS had greatly floundered the previous year, that the company was therefore constantly on the verge of bankruptcy, vendors were not paid, and employees were constantly worried whether the company could make payroll and pay their benefits. The Management Team added details regarding its frustrations and recounted how Modrovich had over time ignored recommendations of the Management Team, put his personal interests ahead of the company's, and jeopardized the long-term viability of MAS. The Management Team questioned Modrovich's capacity for leadership, complained of his "erratic and non-sensical" behavior, and advised that the Management Team could "no longer operate effectively in an environment where the Company lacks adequate working capital and where the CEO threatens legal action when his proposals, which we believe are not in the best interest of the Company, are not approved." The Management Team requested the MAS Board of Directors to take immediate action as to the continued leadership of the company.

14. Confronted with MAS's tenuous viability as a company, the uniform displeasure of the company's top management, and a

realization that Modrovich, although a gifted scientist, did not have the business and executive skills and acumen to direct the company through the swirl of complexities and difficulties that it now faced, the MAS Board in April, 2001, voted over Modrovich's dissent to terminate Modrovich for cause as an employee of the company.  New litigation between the parties broke out that same month arising out of new controversies and the action of the MAS Board to terminate Modrovich.

<u>Formation and Content of the Consulting Agreement</u>
<u>That is the Subject of the Alleged Interference</u>

15.   The parties entered into a second settlement agreement on May 16, 2001, to settle the latest flurry of litigation and controversies among the parties.

16.   The comprehensive settlement of May 16, 2001, was memorialized in (i) Settlement Agreement and Releases; (ii) Consulting Agreement Between MAS and Modrovich, as "consultant," and (iii) Amendment to Shareholders' Agreement, amending the Shareholders' Agreement originally entered by Fisher, MAS, Modrovich, and certain minority shareholders, as part of the previous March 2, 2001, settlement.

17.   In the May 16, 2001, Release, Modrovich released MAS, directors and officers of MAS, Fisher and all subsidiaries, directors and officers of Fisher, from and against any and all claims of any form, known or unknown, which Modrovich may have had

as of that date against any of those parties.  Mutual releases flowed the other way as well.

18.  In the Consulting Agreement of May 16, 2001, among other things, Modrovich resigned as chief executive officer of MAS, but retained the title of chairman of the Board of Directors of MAS at the pleasure of the Board.  He was also designated as a consultant to MAS and as the company's "Chief Science Officer." Notwithstanding his titles of consultant, "Chairman of the Board," and "Chief Science Officer" of MAS, Section 2(a) of the Consulting Agreement specifically provided that Modrovich "shall not . . . be considered to be an officer or employee of [MAS] and shall not have the power or authority to contract in the name or bind the Company, except as may be expressly stated in a written delegation of such authority by the Board."

19.  Under the Consulting Agreement Modrovich was to be paid a reduced consultant fee after August 31, 2001, of $350,000 per year for the balance of the five-year base term of the Agreement. There were provisions for termination of the Consulting Agreement without cause, or for cause, or for good reason, with those terms explained and the consequences of termination under the different possibilities spelled out.  Modrovich's consulting services were to be provided as reasonably requested from time to time by the Board, but the Board was not required to request any services.

20.   Section 6(e) of the Consulting Agreement specifically prohibited Modrovich from disclosing any secret or confidential information, knowledge, or data of MAS, "including without limitation customer lists, pricing lists, trade secrets, processes, formulae, plans, proposals, financial or sales data, and other information," and further provided that all information relating to MAS obtained by Modrovich during his employment by MAS, or during the period of the Consulting Agreement, was "presumed to be confidential unless and until such information has become generally disclosed to the public . . . otherwise than through unauthorized disclosure by [Modrovich]."

21.   In Section 6(f) of the Consulting Agreement Modrovich agreed to "disclose promptly to [MAS] or its nominee any developments, techniques, modifications, procedures, formulas, ideas, trade secrets, innovations, systems, programs, know-how or designs related to the [business of MAS] that he conceives, develops or reduces to practice during the Period of Consultancy." In this clause Modrovich further agreed that all of his right, title, and interest in such inventions, discoveries, developments, modifications, procedures, ideas, innovations, systems, programs, know-how, or designs shall belong to MAS, and that all of the foregoing was also subject to the same non-disclosure requirements set forth in Section 6(e) of the Consulting Agreement.

22.   Modrovich alleges that Fisher tortiously interfered with
this Consulting Agreement by directing MAS to terminate Modrovich
as a consultant for cause when the MAS Board did so on March 28,
2003.

<u>MAS's Business Struggles After
the Consulting Agreement was Formed</u>

23.   In the nearly two years that followed execution of the
Consulting Agreement on May 16, 2001, and before the consultancy
was terminated on March 28, 2003, MAS continued to struggle for its
own survival.   Its revenues dropped further in 2002 and the need
for cash continued.   The MAS Board after the May 16, 2001,
settlement consisted of Modrovich, as chairman, and four designees
of Fisher:   Paul Meister, David DellaPenta, Todd M. DuChene, and
David R. Murray.   Murray, who had no prior relationship with
Fisher, was chosen as chief executive officer and president of MAS.
A permanent standing executive management committee was appointed,
with that committee being charged to report to the full Board of
Directors.

24.   Modrovich regularly sought MAS's financial records and
other confidential data ostensibly to fulfill his role as a member
of the MAS Board of Directors.   At the Board meeting held in July,
2001, director DuChene told Modrovich that MAS would make all
corporate records available to Modrovich, including the president's
monthly report that provided a complete summary of all the

10

business's key issues and initiatives, to allow Modrovich to fulfill his fiduciary duties as a director.   One Board member, however, complained about Modrovich making continued requests for seemingly irrelevant materials and sending threatening letters from lawyers, and urged him instead to seek to help MAS "to get back on its feet."

25.   MAS was appraised by Valuation Research Corporation in November, 2001, to have a fair market value of $1.6 million.   By that time, more litigation had been filed by minority shareholders, entitled <u>Modrovich, et al. v. MAS</u>, and this litigation was discussed at that month's MAS Board meeting.

26.   At the following MAS Board meeting held three months later, MAS's new chief financial officer, Eric Scheinerman, reported that B.A. Capital Company was unwilling to extend MAS's $6 million senior debt due on March 2, 2002, and that seven financial institutions had declined to refinance the debt due to MAS's poor financial performance, illiquid collateral, and its current default status.   Scheinerman requested that the company's equity holders provide the cash necessary to extinguish the senior debt.   The MAS Board voted to take steps necessary to issue additional stock to raise capital and also to re-establish discussions with B.A. Capital in an effort to obtain a discount on the $6 million indebtedness.

27.   A special meeting of the MAS Board was called in March, 2002, at which it was reported that February's financial performance had been "disastrous," that the year's revenues were expected to be down $9 million from plan, that the corporation was in default under its senior credit agreement with B.A. Capital, as a result of which all of MAS's $26 million of debt was in default, and that cashflow was turning negative.   There were on-going discussions with B.A. Capital.   At this meeting David R. Murray resigned as president and chief executive officer and was replaced by Anthony Palmer, effective April 1, 2002.   The MAS Board also established a temporary Bankruptcy Committee authorized to review and, if necessary, to file for protection under Chapter 11 of the Bankruptcy Code on behalf of MAS.

28.   Modrovich in 2001 and 2002 remained fixed on trying personally to regain control of MAS for himself.   He called for a special meeting of the MAS Board, held in mid-April 2002, where he inquired whether the Board would consider selling the company. Director DuChene explained to Modrovich that the company had too much debt, over $26 million, to sell at any profit, and was forecasting an operating loss of $1 million.   Thus, he explained there would be no chance of selling MAS that would lead to any equity and that it was not in the best interests of MAS to waste time and resources on a futile effort.

29.  The new equity offering approved by the MAS Board to raise desperately needed cash for the company expired on April 26, 2002.  Again, Modrovich declined and only Fisher subscribed to the offering.  This resulted in Fisher's ownership increasing to approximately 91.8% of the issued and outstanding common stock of MAS.

30.  About two and a half months later, Modrovich sent to Fisher a drag-along sale notice in the name of his entity Hunnavix, pursuant to Section 3.5(b) of the Shareholders' Agreement of March 2, 2001, as amended May 16, 2001.  This contrived drag-along offer by Modrovich is described and discussed in the Memoranda and Orders entered September 28, 2003, December 18, 2003, and September 1, 2004, in which the Court in the last Order cited granted summary judgment to Fisher declaring as a matter of law that Fisher was not obligated under the drag-along clause to sell its shares in MAS to Hunnavix.

31.  At the MAS Board Meeting on August 19, 2002, the Board attempted to discuss with Modrovich the drag-along proposal of Hunnavix, but Modrovich declined to answer questions on the subject.  The Board also discussed the desirability of a merger with Fisher, which was possible in view of Fisher's ownership of more than 90% of MAS, and received from MAS chief financial officer Scheinerman the opinion that a merger with Fisher was MAS's most prudent option.

13

32.   In September, 2002, MAS was merged into a wholly owned subsidiary of Fisher, which subsidiary in turn changed its name to MAS.

### Circumstances Surrounding Fisher's Alleged Interference With the MAS/Modrovich Consulting Agreement

33.   In much of 2002 and into 2003 the litigation between Modrovich, MAS, Fisher, and various officers and directors of the companies blazed like prairie fires in both Texas and California. MAS, however, continued to pay to Modrovich all agreed compensation to which he was entitled under the Consulting Agreement of May 16, 2001, although the Board never chose to give him any consulting assignments.

34.   Then, in the course of pretrial discovery in pending litigation among Modrovich, Fisher, and MAS, Modrovich in early 2003 produced documents to Fisher's outside counsel who, after examining them and what they revealed, reported the discoveries and delivered copies of certain of the produced materials to Fisher and to MAS.  This led to a meeting of the MAS Board of Directors being convened on March 28, 2003, with Directors Paul M. Meister, Todd M. DuChene, Kevin P. Clark, David DellaPenta, and Eric Scheinerman all being present either in person or by teleconference.  These MAS directors were also employees, and some were officers, of Fisher. DuChene, a MAS director, was also general counsel of Fisher.

14

35.  At this meeting the MAS Board focused on the Consulting Agreement dated May 16, 2001, between MAS and Modrovich, and the relative rights and obligations contained therein.  In particular, the Board examined Modrovich's obligation to maintain in confidence all of MAS's confidential information that he had obtained both during his employment by MAS and during the period of his Consulting Agreement, which was still in effect, as well as Modrovich's obligation to disclose and deliver to MAS any inventions, discoveries, procedures, ideas, innovations, systems, programs, etc. that he conceived or developed during the period of consultancy.

36.  Director DuChene reported to the MAS Board that it had been discovered that Modrovich over a long period of time, and notwithstanding Section 6(e) of the Consulting Agreement, had been engaging in repeated, multiple, and far-reaching unauthorized disclosures of MAS's confidential financial material and other confidential data dating back almost to the day that he had promised not to do so in the Consulting Agreement of May 16, 2001. In addition, DuChene reported that Modrovich's document production revealed that Modrovich had filed a provisional patent application on his idea of a program to handle, process, and provide diagnostic information to physicians, which invention had never been disclosed to MAS pursuant to Section 6(f) of the Consulting Agreement.

37.   DuChene's report to the MAS Board included his review of numerous examples from the produced documents indicating that Modrovich had made unauthorized disclosures of MAS's confidential financial statements and other data without being authorized to do so by MAS.  He had also used his title of "Chairman of the Board" to assume apparent authority to act for MAS in disclosing MAS's confidential materials to a number of third parties, notwith-standing the express stipulation in the May 16, 2001 Consulting Agreement that Modrovich was not an officer or employee of MAS and had "no power or authority to contract in the name of or [to] bind [MAS]."  Among the documents examined or summarized in DuChene's presentation to the MAS Board of Directors were the following:

- A "Representation Agreement" dated May 23, 2001 [seven days after Modrovich agreed to the confi-dentiality clause in his Consulting Agreement] in which Modrovich granted to Paul Marcuex a non-exclusive right to represent Modrovich to acquire financing for the purchase of shares in MAS.  Other documents that followed disclosed that Modrovich gave substantial amounts of MAS's confidential material to Marcuex.

- A putative July 6, 2001 proposal from "Angel Holding Group" in Tokyo, for purchase of shares in MAS, making reference to the "information relating to MAS that [Modrovich] heretofore provided to Angel" and setting as a condition for the putative offer that "MAS shall not have suffered any material adverse change in its financial condition, results of operations, or prospects since June 15, 2001."

- A "Confidentiality Agreement" dated January 18, 2002, between Navix, Inc., Modrovich's wholly owned entity, and Paul Marceux, indicating that Marceux

16

was to receive "financial materials of [MAS] of every description, including, without limitation, periodic financial[s] issued by [MAS]." The agreement further acknowledges that Navix, Inc. is a company controlled by Ivan Modrovich, who himself has a consulting agreement with [MAS], and claims that the 'Confidentiality Agreement' is intended "to assist Mr. Modrovich in performing his functions as a consultant." (Modrovich admits now that MAS never gave to him any consulting assignments.)

• An email from Paul Marceux at Crema LLC to Navix [i.e., Modrovich] dated February 18, 2002, revealing that Marceux had received financial information about MAS contained in a "PPM"--a private placement memorandum.

• A June 14, 2001 "Confidentiality and Financial Disclosure Agreement" between Business Acquisition Group ("BAG") and Modrovich referring to Modrovich as the "Owner" of a "company" (i.e., MAS), and indicating that BAG had received and been empowered to "furnish[] to potential investors/buyers' confidential information on [Modrovich's] company including but not limited to financial records, product information, market data, and operating knowledge, solely for the purposes of determining whether or not to consider an acquisition of all or part of the company owned by the undersigned [Modrovich]."

• A letter agreement between The Corporate Vail, LLC ("Vail"), Navix, Inc., and Modrovich dated July 17, 2001, indicating that Navix and Modrovich were to "furnish Vail with information concerning MAS, including among other things: corporate legal documentation; prior placement memoranda, business and/or marketing plans, and all materials and information related to MAS's business," which information was to be "materially complete and correct," and which Vail was to use "in connection with assisting [Navix and Modrovich] in raising capital and or financing. . . ." The letter agreement also claims that "[i]n no event will [Navix and Modrovich] provide information concerning MAS that is privileged or confidential or the

17

disclosure of which would not be in the best interest of MAS."

- An August 31, 2001 facsimile from Modrovich to Eric Ek, requesting that Ek "review the attached financials of MAS for FY'00 and FY'01," and indicating that Modrovich was also sending to Ek "the previous FY'00 financials we prepared but never audited," to be used as a "comparative base."

- A September 12, 2001 "Confidentiality Agreement" between Navix, Inc. and Eric Ek--substantially similar to the January 18, 2002 Confidentiality Agreement between Navix and Paul Marceux--indicating that Ek was to receive "financial materials of [MAS] of every description, including without limitation, periodic financial[s] issued by [MAS]."

- An exchange of emails between Modrovich and John Van Tright on September 11th and 12th, 2001, requesting Van Tright to "review some MAS Financials for me and update the valuation information we generated earlier this year," and revealing that Modrovich believed an executed confidentiality agreement was necessary before such information could be shared with Van Tright.

- A November 6, 2001 facsimile from Getty Gacek at EquiCo to Modrovich, transmitting a "Confidentiality Agreement" requested by Modrovich, in which EquiCo identified Modrovich as "Chairman" of MAS. The agreement itself provided that Modrovich would disclose to EquiCo "certain confidential and proprietary information of [Modrovich as MAS Chairman], including trade secrets, know-how, inventions, techniques, processes, customer lists, financial information, [and] sales and marketing plans."

- A November 6, 2001 letter from Strategic Group Equities, Inc. ("SEGI") to Modrovich, indicating that in order for SEGI to evaluate the merits of MAS, Modrovich would have to provide SEGI with "certain financial and other information concerning [MAS]," which information MAS considered "sensitive and highly confidential."

18

- A November 26, 2001 facsimile from Modrovich to certified public accountant Scott Kirvis, revealing that Modrovich had, prior to November 11, 2001, provided Kirvis with "the KPMG audited financial statements [of MAS] for the period ended March 31, 2000," which Kirvis had then reviewed and "restated" for "one-time charges." Modrovich further asked Kirvis to review his [Modrovich's] additional suggested changes and "return the information I provided at your earliest convenience."

- A March 7, 2002 email from Jan Vail to Modrovich containing the text of an email from Joe Castano to Jan Vail earlier that same day, with restated MAS financials attached.  The email reveals that Modrovich had requested Castano recast MAS's financial statements audited by KPMG, that Castano found some of Modrovich's proposed adjustments "difficult to defend," that Castano would not be able to "support them under oath," that Castano would "require indemnification and release from any and all claims that would result if litigation and or claims arise as a result of there [sic] use," and that he could not "at this time" fulfill Modrovich's "other expectations in developing these financials. . . ."

- A March 22, 2002 email from Jan Vail to Navix [i.e., Modrovich] revealing that Modrovich had been seeking legal advice on "the status of the confidentiality provisions of [his] agreement with Fisher/MAS," and suggesting that Modrovich stood to lose less from talking about his plan to an interested third party than remaining silent "so as not to incur the wrath and penalties of disclosure."

- A number of June 7, 2002 emails sent separately from Navix [i.e. Modrovich] to Gary Shemano, Chris Skinner, and Scott Garrett, and John Stewart, each of which contained a proposal for the acquisition of MAS and disclosed MAS financial information, but purported to make this information subject to "our confidentiality agreement."

- A June 7, 2002 facsimile from Modrovich to John Stewart containing an executed Confidentiality Agreement between Merrill, Lynch, Pierce, Fenner &

Smith Incorporated ("Merrill Lynch"), MAS, and
Modrovich. Modrovich's signature appears under the
heading "Medical Analysis Systems, Inc./Ivan E.
Modrovich," thereby suggesting that he held himself
out as capable of binding MAS. (This was at a time
when Modrovich had no authority to act for or to
bind MAS to anything.)

- A June 25, 2002 facsimile from Modrovich to John
  Stewart containing an executed Consent to Advisory
  Referral form, which stated that Merrill Lynch "has
  been requested by [MAS] and [Modrovich] to provide
  to [MAS and Modrovich] or assist [them] in
  obtaining advisory services . . . in connection
  with the contemplated recapitalization, sale of
  business, or other corporate finance service." The
  form further reveals that Modrovich purported to
  authorize Merrill Lynch to disclose confidential
  MAS information to another third party, Shattuck
  Hammond Partners, LLC.

- An exchange of emails between Navix, Inc. [i.e.,
  Modrovich] and Mark Stolper of Broadstream Capital
  on or about July 8, 2002, which reveals that
  Modrovich had previously met and conversed with
  Broadstream representatives in person, and that
  Broadstream wanted Modrovich to send to it "the
  language about your drag-along and the right of
  first refusal, and the monthly financials for MAS
  from the beginning of calendar [year] 2002."

- An August 20, 2002 letter from Larry Hoffman of
  EquiCo to Modrovich [whom he identified as
  "Chairman of the Board"] explaining that EquiCo
  was returning "the financials you sent . . . to
  enable us to determine the preliminary value of
  your company," thereby indicating that Modrovich
  had previously disclosed MAS financials to EquiCo,
  and had given it the false impression that his
  nominal title as Chairman of the MAS Board gave him
  authority actually to act for and to bind MAS.

38. Modrovich's disclosures of MAS's confidential financial

material and other data took place over such a long period of time

and on so many occasions and to so many different persons, that

20

Modrovich testified at trial that he did not know how many people had seen the material he had divulged.

39.   The MAS Board at its March 28, 2003, meeting, after discussing the information and documents presented by Director DuChene, determined that Modrovich was not authorized and was in fact prohibited from making the disclosures of MAS's confidential information, that he was obliged to have disclosed to MAS his related provisional patent application, which the Board regarded as related to the scope of MAS's business, and that he had repeatedly violated and breached the covenants of his Consulting Agreement as well as the fiduciary duties he owed to MAS as a director.  Finding that harm had resulted to MAS from Modrovich's conduct, the MAS Board adopted a resolution to terminate Modrovich's consultancy pursuant to Section 4(e) of the Consulting Agreement for "cause," finding that such was in the best interest of MAS and further, that MAS should cease making payments to Modrovich because of his conduct.   The Board further authorized that notice of his termination be delivered to Modrovich on behalf of MAS.

40.  By letter dated March 31, 2003, MAS notified Modrovich that the Consulting Agreement was terminated due to his material, non-curable breaches of that agreement, and that MAS would be seeking judicial determination confirming its rescission of the agreement.  He was told that he would receive payment of the consultancy fee through April 4, 2003, and thereafter the fee would

21

be deposited in an interest-bearing account pending the outcome of litigation between MAS and Modrovich concerning the agreement.

41.   The litigation between Modrovich and MAS regarding the Consulting Agreement and whether it was breached and by whom, is pending in Cause No. 213679, <u>Ivan E. Modrovich, Plaintiff v. Medical Analysis Systems, et al, Defendants</u> in the Superior Court of California, County of Ventura, California.

<u>Findings on Fisher's Conduct</u><br><u>and the Conduct of the MAS Board of Directors</u>

42.   Each of the members of the MAS Board of Directors in their meeting on March 28, 2003, when they acted to terminate Modrovich's Consulting Agreement, acted solely as a director of MAS and each made his decision based only on what he regarded as being in the best interest of MAS.

43.   None of the directors of MAS in voting on the resolution to terminate Modrovich's Consulting Agreement was acting in his capacity as an employee of Fisher or as an officer or director of Fisher.

44.   Each of the members of the MAS Board of Directors, after reasonable inquiry and consideration, exercised reasonable business judgment as a director of MAS in voting on the resolution and deciding to terminate Modrovich's Consulting Agreement.

45.   Neither the Board of Directors of Fisher nor its chief executive officer (who was not a member of the MAS Board) engaged

in any action wrongfully to interfere with the Consulting Agreement between MAS and Modrovich, and none of those persons directed the decision of the members of the MAS Board of Directors, acting as the Board of MAS, when they voted to terminate Modrovich's Consulting Agreement.

46. Although individual members of the MAS Board of Directors were also employees of Fisher, when serving and acting as members of the MAS Board of Directors they consciously acted solely as directors of MAS and in what they believed to be in the best interests of MAS.

47. MAS and Fisher did not have conflicting interests that would have conflicted the members of the MAS Board of Directors in acting solely in the best interest of MAS, or that would have refuted the presumption of their good faith embodied in the business judgment rule.

48. Although there is no evidence that Fisher through its Board of Directors, its chief executive officer, or other authorized officers, directed MAS to terminate Modrovich's consultancy, Fisher could have directed such action for the predominant purpose of advancing the interest of MAS, its wholly owned subsidiary that was subject to the most direct injury from the apparent misconduct of Modrovich.

49. To the extent that members of the MAS Board held dual roles as employees or officers of Fisher when they terminated

Modrovich's consultancy, they did so in the good faith belief that termination of the consultancy and suspension of compensation to Modrovich was in the best interest of MAS.

50.   At no time did Fisher engage in intentional acts designed to induce a breach or disruption of the Consulting Agreement relationship between MAS and Modrovich.

51.   At no time did Fisher tortiously interfere with the Consulting Agreement between MAS and Modrovich.

## Conclusions of Law

1.   The Court has jurisdiction over the parties and the subject matter.   28 U.S.C. § 1332.

2.   Venue properly lies in this district and division.

### Determining the Applicable State Law

3.   "To determine the applicable law, a federal court sitting in diversity applies the choice of law rules of the forum." Benchmark Elecs., Inc. v. J.M. Huber Corp., 343 F.3d 719, 726 (5th Cir. 2003).

4.   "Texas courts use the 'most significant relationship' test set forth in the Restatement (Second) of Conflict of Laws (1971) for all choice of law cases except contract cases in which the parties have agreed to a valid choice of law clause."   Mayo v. Hartford Life Ins. Co., 354 F.3d 400, 403 (5th Cir. 2004).

24

5.   California, the state where Modrovich resided during the period of his Consulting Agreement with MAS and the state that was MAS's principal place of business, is the State with the most significant relationship to the tort claim alleged by Modrovich against Fisher regarding that Consulting Agreement.

6.   California law applies to this case.

### MAS's Directors Serving Also as Employees of Fisher

7.   "'[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.'"   United States v. Bestfoods, 118 S. Ct. 1876, 1888 (1998)(quoting American Protein Corp. v. AB Volvo, 844 F.2d 56, 57 (2d Cir.), cert. denied, 109 S. Ct. 136 (1988)).

8.   "This recognition that the corporate personalities remain distinct has its corollary in the 'well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do "change hats" to represent the two corporations separately, despite their common ownership.'" Id. (quoting Lusk v. Foxmeyer Health Corp., 129 F.3d 773, 779 (5th Cir. 1997)).

9.   "Since courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary," the plaintiff must show that, despite

the general presumption to the contrary, the dual officers and directors were acting in their capacities as officers and directors of the parent, and not in their capacities as officers and directors of the subsidiary, when they committed the acts in question.  *See* id. (internal quotations and citations omitted); Sonora Diamond Corp. v. Superior Court of Tuolumne County, 99 Cal. Rptr. 2d 824, 844 (Cal. Ct. App. 2000).

10.  "[T]he presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent."  Bestfoods, 118 S. Ct. at 1888 n.13.

11.  The MAS Board of Directors, and each of its members, acted lawfully in their capacities as directors of MAS in a manner perfectly consistent with the norms of corporate behavior, and were not acting in their roles as employees or officers of Fisher, when they acted to terminate Modrovich's Consulting Agreement.

## The Business Judgment Rule

12.  "The business judgment rule is a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions."

<u>Everest Investors 8 v. McNeil Partners</u>, 8 Cal. Rptr. 3d 31, 45 (Cal. Ct. App. 2003). Specifically, "'[t]he common law business judgment rule has two components--one which immunizes [corporate] directors from personal liability if they act in accordance with its requirements, and another which insulates from court intervention those management decisions which are made by directors in good faith in what the directors believe is the organization's best interest.'" <u>Lamden v. La Jolla Shores Clubdominium Homeowners Ass'n</u>, 980 P.2d 940, 944 (Cal. 1999)(quoting <u>Lee v. Interins. Exch. of the Auto. Club of S. Cal.</u>, 57 Cal. Rptr. 2d 798, 810 (Cal. Ct. App. 1996)). When the business judgment rule's requirements are met, "a court will not substitute its judgment for that of the corporation's board of directors." <u>Id.</u> at 945.

13. Although the business judgment rule "sets up a *presumption* that directors' decisions are made in good faith and are based upon sound and informed business judgment," the presumption does not apply "in circumstances which inherently raise an inference of conflict of interest." <u>Lee</u>, 57 Cal. Rptr. 2d at 811; *see* <u>Everest</u>, 8 Cal. Rptr. 3d at 45. Where such a conflict is inferable, "directors may reasonably be allocated the burden of showing good faith and reasonable investigation." <u>Lee</u>, 57 Cal. Rptr. 2d at 811. In most cases, however, "the presumption created by the business judgment rule can be rebutted only by affirmative allegations of fact which, if proven, would establish fraud, bad faith,

27

overreaching or an unreasonable failure to investigate material facts." Id.; *see* Everest, 8 Cal. Rptr. 3d at 45 ("The business judgment rule does not shield actions taken without reasonable inquiry, with improper motives, or as a result of conflict of interest."). Furthermore, "[i]nterference with the discretion of the directors is not warranted in doubtful cases." Lee, 57 Cal. Rptr. 2d at 811.

14.  Grounds for overcoming the presumption of good faith embodied in the business judgment rule include: (1) actions which are "inconsistent with the business purpose that is asserted," or (2) actions which are "so clearly against the interest of the affected organization that the challenged actions must have been the result of undue influence or a conflict of interest." Id. at 812.

15.  Since the action taken by the MAS Board to terminate Modrovich's consultancy occurred after reasonable inquiry and study, and was neither inconsistent with MAS's business purpose or in any manner contrary to the interest of MAS, no conflict of interest is suggested.

16.  Since the action taken by the MAS Board to terminate Mondrovich's consultancy was not tainted by circumstances that inherently raised a conflict of interest for the directors in acting as the Board of MAS while they were also employees/officers of Fisher, the presumption is unrefuted that they acted as MAS

directors in good faith upon sound and informed business judgment in the best interest of MAS.

17.   The mere fact that entities have interlocking boards does not establish fraud, bad faith, or gross overreaching with respect to any particular act. *See* id.

18.   Notwithstanding the extent to which there may have been interlocking boards of MAS and Fisher in March, 2003, with an opportunity for Fisher to exercise undue influence over MAS, no fraud, bad faith, overreaching or undue influence occurred such as to refute the presumption that the MAS Board members in good faith exercised their business judgment in the best interest of MAS.

## Essential Elements for Proof of Contractual Interference

19.   "To prevail on a cause of action for intentional interference with contractual relations, a plaintiff must plead and prove (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." Reeves v. Hanlon, 95 P.3d 513, 517 (Cal. 2004); *see* Quelimane Co. v. Stewart Title Guar. Co., 960 P.2d 513, 530 (Cal. 1998); Pacific Gas & Elec. Co. v. Bear Stearns & Co., 791 P.2d 587, 590 (Cal. 1990).

20.  Furthermore, "the plaintiff need not prove that a defendant acted with the primary purpose of disrupting the contract, but must show the defendant's knowledge that the interference was certain or substantially certain to occur as a result of his or her action." Reeves, 95 P.3d at 517.

21.  Modrovich was unable at trial to prove at least one essential element of contract interference, namely, that Fisher acted in any way with the intent or design to induce a breach or disruption of Modrovich's Consulting Agreement.  Hence, Modrovich cannot prevail on this claim.

## Fisher's Privilege to Interfere

22.  "The owner of an entity enjoys a qualified privilege to terminate a contract to which the entity is a party, provided that the owner's predominant purpose in inducing the breach is to further the entity's interests." Wanland v. Los Gatos Lodge, Inc., 281 Cal. Rptr. 890, 899 (Cal. Ct. App. 1991); Webber v. Inland Empire Invs., Inc., 88 Cal. Rptr. 2d 594, 608-09 (Cal. Ct. App. 1999); see GHK Assocs. v. Mayer Group, Inc., 274 Cal. Rptr. 168, 185 (Cal. Ct. App. 1991); Culcal Stylco, Inc. v. Vornado, Inc., 103 Cal. Rptr. 419, 421-22 (Cal. Ct. App. 1972); Kozlowsky v. Westminster Nat'l Bank, 86 Cal. Rptr. 52, (Cal. Ct. App. 1970); see also Shapoff v. Scull, 272 Cal. Rptr. 480, 484 (Cal. Ct. App. 1990) (stating that tort liability of owner, director, or manager depends

upon whether that person was acting to protect interests of entity with whose contract it interfered), *disapproved of on other grounds by* Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 869 P.2d 454, 464 n.10 (Cal. 1994).

23.  Under California law, the qualified privilege of an owner to terminate a contract of the entity it owns is an affirmative defense available to the owner in an action brought by the counterparty to the contract. *See* Culcal, 103 Cal. Rptr. at 420; SI Collins v. Vickter Manor, Inc., 306 P.2d 783, 788 (Cal. 1957).

24.  Although there is no evidence that Fisher interfered with the Consulting Agreement by directing MAS to terminate Modrovich's consultancy or otherwise, Fisher had a qualified privilege to do so given the absence of conflict between MAS and Fisher and because the predominant benefit of such action would have inured to MAS, the entity most directly subject to injury by Modrovich's unauthorized dissemination of MAS's confidential information and his non-disclosure to MAS of his new patentable ideas to which MAS may have been entitled.

25.  Because Modrovich was unable to prove any intentional conduct on the part of Fisher to induce a breach or disruption of Modrovich's consulting agreement, and because Fisher, had it chosen to do so, enjoyed a qualified privilege to direct its wholly owned subsidiary MAS to terminate the Consulting Agreement for the primary purpose of furthering MAS's best interests, which would

31

have been warranted under the facts of this case, Fisher is entitled to a take nothing judgment against Modrovich on his contract interference claim.

20. If any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such; and if any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

The Clerk shall notify all parties and provide them with a true copy of these Findings of Fact and Conclusions of Law.

SIGNED at Houston, Texas, on this 4th day of August, 2005.


_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE