O

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FISHER SCIENTIFIC | § | |
| INTERNATIONAL, INC. and FISHER | § | |
| SCIENTIFIC COMPANY, L.L.C., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-0467 |
| | § | |
| IVAN MODROVICH and | § | |
| HUNNAVIX, KFT., | § | |
| | § | |
| Defendants. | § | |

ORDER ON ATTORNEYS' FEES

This case was substantially adjudicated on motions to dismiss
and cross motions for summary judgment by Orders entered
September 8, 2003, December 18, 2003, and September 1, 2004. All
that remained after September 1, 2004, was (1) Ivan Modrovich's
counterclaim that Fisher Scientific International, Inc. and/or
Fisher Scientific Company, L.L.C. ("Fisher") interfered with a
contract, to wit, a Consulting Agreement between Medical Analysis
Systems, Inc. and Ivan Modrovich ("Modrovich"), and (2) Fisher's
claim against Modrovich for an award of attorneys' fees.
Modrovich's contract interference counterclaim was tried to the
Court for five days in late July, 2005, and the Court filed its
Findings of Fact and Conclusions of Law on August 4, 2005, holding
that Fisher was entitled to a take-nothing judgment against

Modrovich.  The parties agreed to submit to the Court on affidavits the attorneys' fees dispute, which they have now done.

As the Fifth Circuit observed, "No authority need be cited for the fact that [legal fees and costs] disputes should *not* be a separate, or second litigation."  <u>Mid-Continental Cas. Co. v. Chevron Pipeline Co.</u>, 205 F.3d 222, 233 (5th Cir. 2000). Unfortunately, this would not be just the "second" litigation but, by the Court's rough count, the *fifth* or *sixth* litigation between Modrovich and Fisher.  *See* Memorandum and Order entered September 8, 2003, at 3-9, where three Houston lawsuits between these parties are described plus the "California Lawsuit" filed by Modrovich in Ventura County, California, which raised the same issues that were raised in this case.  It appears that these years of disputes between Fisher and Modrovich have led not only to lawsuits but also to complete distrust, constant contentiousness, and open hostility between the parties.  Regrettably, the palpable antagonism between the parties appears to have affected the conduct of this litigation by their respective lawyers.  Baseless claims were made by both sides, discovery disputes arose that should not have required judicial intervention, and countless other needless actions were taken by both sides along the way, but with Modrovich on the whole being the greater offender.

General Nature of the Case

The principal dispute concerned the parties' respective rights and obligations in shares of stock in Medical Analysis Systems, Inc. ("MAS") pursuant to the terms and conditions of a Shareholders' Agreement executed on March 2, 2001, by Fisher Scientific International, Inc., MAS, Ivan Modrovich, and other minority shareholders of MAS ("Shareholders' Agreement"). In particular, the issue was whether Modrovich's proposed sale of his shares in MAS qualified as a drag-along sale under Section 3.5 of the Shareholders' Agreement and, as a consequence thereof, whether Fisher was obligated under the agreement to sell its shares in MAS to Hunnavix for a pittance. Fisher prevailed on that dispute on summary judgment. Modrovich's counterclaim for contract inter-ference with his Consulting Agreement, as noted above, went to trial and again, Fisher prevailed.

Section 6.3(a)(iv) of the Shareholders' Agreement states:

> Each of the parties hereto irrevocably and uncondi-tionally . . . (iv) agrees that the losing party shall pay to the prevailing party the attorneys' fees and expenses incurred by the prevailing party in such action.

Fisher as the prevailing party bases its claim for recovery of attorneys' fees and expenses on this clause in the Shareholders' Agreement and on California law. All parties are in accord that the fees and expenses must be reasonable and necessary.

<u>Fisher's Claims for Fees and Expenses</u>

Fisher claims that its attorneys and legal assistants spent a total of 11,649 hours in preparation of this case through summary judgment (or August 31, 2004), and an additional 4,555 hours from September 1, 2004, through trial of the tortious interference with contract counterclaim.  Fisher states that it staffed the case with "a core team of attorneys and paralegals who jointly worked more than 91% of all hours on the case."  This core team consisted of four partners and four associates, plus two legal assistants. Fisher claims that through summary judgment on September 1, 2004, (when Fisher prevailed on its claim, which left only Modrovich's interference with contract counterclaim to be tried), its counsel devoted 11,649 hours to the case, for which a total lodestar fee of $2,996,827.50 is claimed.  In the eleven months after September 1, 2004, through the trial of Modrovich's counterclaim in late July, 2005, Fisher's counsel reports another 4,554.5 hours worked and an additional lodestar fee claim of $1,339,167.50.  In all, from inception through trial, Fisher claims that 16,203.5 hours were spent on this case for aggregate fees of $4,335,995.00.  From this sum, Fisher deducts $152,780.00 for time spent on Fisher's failed securities and civil conspiracy claims, which the Court dismissed on motions filed by Modrovich and Hunnavix, KFT.  This leaves a net

4

lodestar fee claim for $4,183,215, plus expenses of $766,462.81, adding up to a total claim for $4,949,677.81.

In support of its claims, Fisher has filed three large folders consisting of many hundreds of pages of billing statements submitted by its counsel to Fisher over a period of approximately two and one-half years, together with a detailed Declaration from its lead counsel, Hurlie H. Collier.  In addition, Fisher submits resumes of its attorneys who worked on the case, a Declaration of a well-respected attorney, Jesse R. Pierce, who expressed the opinions that the hourly rates charged by Fisher's law firm for its partners, associates, and legal assistants are reasonable and customary in Houston, Harris County, Texas, and that the $4,335,995.00 in attorneys' fees billed to Fisher for this case were reasonable and necessary, and are customary for attorneys in Houston handling matters of similar complexity and size to the present case.  Fisher also has presented various other documentary evidence indicating the reasonableness of the hourly fees charged by Fisher's counsel.

### Modrovich's Opposition to Fisher's Claims

Defendant Modrovich has filed a lengthy brief in opposition, accompanied by a detailed Declaration from his lead counsel, Robert M. Steele, of San Diego, California, and a Declaration by his legal assistant who has made a detailed examination of the billings

relied on by Fisher.  Modrovich has also submitted the affidavits
of two well-respected Houston attorneys, Paul D. Clote and Harvey
G. Brown, Jr., in which each separately expresses the general view
that a reasonable and necessary attorney's fee for Fisher for
services rendered in the entire case would be in the range of $1
million plus reasonable expenses.  The principal thrust of
Modrovich's arguments and his numerous analyses is that Fisher's
counsel billed for their work on this case a vastly greater sum
than did Modrovich's counsel.  Thus, Modrovich asserts that the
fees and expenses billed to Fisher from February, 2003, through
July, 2005, totaled $5,105,572 compared to only $613,090 billed to
Modrovich for the same time period on this case.  This disparity,
Modrovich argues, is "breathtaking."  He claims that the billable
hours generated by Fisher's counsel during this period of time
totaled 16,203.5 hours, compared to 2,556.07 hours billed by
Modrovich's counsel.  Modrovich has broken these down into month-
by-month analyses, which generally reflect that the disparity in
numbers of hours billed on the two sides of the case continued from
start to finish.  Modrovich argues that the billing records reflect
the names of 49 different persons who billed time on this case to
Fisher, with 30 of these persons billing at least 10 hours, and
seven billing more than 1,000 hours each.

The *Johnson* Factors

In exercising its discretion in awarding attorneys' fees and expenses against a party, this Court has given careful attention to the guidelines set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), which is the principal foundation for that familiar body of Fifth Circuit law regarding awards of attorneys' fees. California law, which applies to the contract, does not appear in conflict with these considerations. *See* PLCM Group, Inc. v. Drexler, 22 Cal. 4th 1084 (Cal. 2000). Moreover, all of the Court's findings on disputed issues of fact are based on a preponderance of the evidence.

Nearly all of the Johnson factors may readily be considered:

- *The novelty and difficulty of the questions.* This case was not one of first impression that raised novel or particularly difficult questions generally requiring more time and effort on the attorney's part.

- *The preclusion of other employment by the attorney due to acceptance of the case.* There is no indication that counsel's employment by Fisher in this case precluded him or his law firm from accepting other cases on account of conflicts of interest and the like.

- *Whether the fee is fixed or contingent.* Fisher's counsel was not employed on a contingency fee basis, although no fee agreement has been presented to the Court. Presumably, counsel expected to be paid for services basically upon an hourly basis plus reimbursement for expenses.

- *Time limitations imposed by the client or the circumstances.* There is no evidence of time limitations having been imposed by Fisher upon the work of its counsel or of other special circumstances that would present a basis for a premium fee.

- *The "undesirability" of the case.* This case did not have an "undesirability" factor in the sense that that term is used in <u>Johnson</u>. *See* 488 F.2d at 719.

- *The nature and length of the professional relationship with the client.* Fisher's counsel evidently had a well-established professional relationship with Fisher, with Fisher's general counsel at the time having formerly been a partner in the law firm. Fisher evidently had a high level of confidence in the law firm and, the Court infers from the evidence that Fisher was satisfied with the large numbers of lawyers and others who worked on this case.

- *The amount involved and the results obtained.* The amounts involved in this lawsuit were substantial. Fisher had invested approximately $30 million in Medical Analysis Systems, Inc. within a couple of years or so before this case was filed, and the principal objective of Fisher's suit was to avoid the loss of its equity in that company as a result of Modrovich's drag-along scheme. In addition, Modrovich sought damages from Fisher in excess of $24 million, which raised the stakes even higher. The stakes were concomitantly high for Modrovich, who was able to retain lawyers in whole or in part on a contingency fee basis. Moreover, he had a large emotional investment in the subject matter of the litigation inasmuch as he had founded MAS to develop and market reagents and he had poured a substantial part of his business career into the building of that company. Thus, the case involved substantial amounts in controversy and, through the efforts of its counsel, Fisher was completely successful. This factor weighs heavily for an award of all reasonable and necessary attorneys' fees to Fisher in accordance with the Shareholders' Agreement.

8

- *The skill requisite to perform the legal service properly*.  In attaining this favorable result for Fisher, its counsel were well prepared, produced good work product, and displayed adequate and requisite skills to perform the legal services properly, with the Court's only reservation being with respect to the altogether-too-common excesses attendant to the unduly contentious behavior of counsel on both sides of the case.  Most of this, however, was precipitated by Modrovich's litigation decisions and tactics.

- *The experience, reputation, and ability of the attorneys*.  The experience, reputation, and abilities of the attorneys representing Fisher were commensurate with others in the profession who have similar years of experience, with the possible exception of Robert Collier, Fisher's lead counsel, whose specialty was primarily in employment law rather than commercial litigation.  Nonetheless, he very competently represented his client in this case.

- *The customary fee*.  The hourly rates claimed by Fisher's lawyers appear generally within a range that is customary for lawyers of their experience in this kind of litigation in Houston, with the possible exception of the rates charged by Collier in the year 2005.  In 2005, Collier inexplicably elevated his rate from $395 per hour to $470 per hour, which one of Modrovich's well-regarded experts states was "on the high end of the range of reasonableness."  Affidavit of Harvey G. Brown, Jr., at 20.

The big factor not yet considered, however, is the first factor listed in <u>Johnson</u>, namely, *the time and labor required* to prosecute and defend this litigation.  This is the critical factor that is at the heart of the present controversy over the fees and expenses claimed by Fisher.  On this factor, <u>Johnson</u> counsels the trial judge to "weigh the hours claimed against his own knowledge,

9

experience, and expertise of the time required to complete similar activities."  Id. at 716.[1]

### The Activities for Which Time and Labor Were Required

In determining what is reasonable and necessary, it would be pointless to examine page by page all of the billing statements submitted to Fisher.  Hundreds of entries are redacted in whole or in part, but even if they were not, to compare the entries of dozens of lawyers to ferret out specific redundancies, duplications of effort, and unnecessary expenditures of time, would be an impossible task.  The Court does not understand the Fifth Circuit to require such of the District Court when the controversy is not focused upon discrete segments of the fee claimed, but rather is a global attack on the total cumulative hours claimed and fees billed.  It is in these circumstances that Johnson instructs the trial court to "weigh the hours claimed against his own knowledge, experience, and expertise of the time required to complete similar activities."

---

[1] Before becoming a judge, the trial judge on this case had 30 years of trial and appellate experience in federal and state courts, in a wide variety of cases involving contract disputes, federal and state securities laws, land titles, oil and gas issues, will contests, federal discrimination law, federal income tax claims, land condemnations, trust law, hostile tender offers, and other commercial matters.  He was lead counsel in a variety of complex lawsuits that often involved larger sums in controversy than the present case.  This Court is very familiar with the necessary staffing requirements for major and highly contentious lawsuits.

10

In this instance, a finding needs to be made as to the time required to complete the "similar activities" of (1) successfully establishing the Court's jurisdiction over Modrovich and Hunnavix, maintaining venue in Houston, and avoiding a stay of proceedings here in favor of Modrovich's California case, (ii) successfully moving for summary judgment on the merits of Fisher's case and defeating Modrovich's many counterclaims and his cross-motion for summary judgment, and (iii) prevailing at trial on Modrovich's counterclaim for interference with his Consulting Agreement.  To accomplish these objectives, Fisher's counsel prepared numerous pleadings, investigated the case, which was complicated by the putative involvement of a foreign entity and documents written in Hungarian, did extensive legal research, wrote a number of briefs in support of and opposition to numerous motions, engaged in document productions, and took more than a dozen depositions.  The discovery phase of the case was particularly contentious, with several motions to compel production, for protective orders, and to enforce orders.  Thousands of pages of documents were produced and examined in the course of wide-ranging discovery.  Prior to summary judgment being granted for Fisher on its case, Fisher's attorneys filed some 66 pleadings, motions, and responsive papers, but Fisher is not solely responsible for this profusion:  Modrovich and Hunnavix filed some 57 documents during the same time frame! Modrovich's California case was also ongoing against Fisher, and

11

Fisher's counsel in this case understandably found it necessary to review the filings in that case and to attend and/or review transcripts for an additional 38 depositions taken in the California case.   Modrovich noticed more than a dozen additional depositions to be taken in this case, for which Fisher's attorneys prepared, but Modrovich then cancelled most of them and ended up taking only two.   Fisher was required to defend against approximately ten meritless counterclaims filed by Modrovich and Hunnavix, which unduly complicated the litigation.   Much more could be recounted about the activities of Fisher's counsel, but it is sufficient to observe that the pleadings and discovery phases were extremely comprehensive and highly contentious, with Modrovich being responsible for most of the excesses even though Fisher deserves some blame as well.

The jurisdictional and venue issues were resolved by the Court's Orders entered September 8 and December 18, 2003.   The summary judgment phase was resolved by an Order entered September 1, 2004.  The third phase, on Modrovich's counterclaim on his Consulting Agreement, was tried to the Court for five days in late July, 2005, and the Court issued its Findings of Fact and Conclusions of Law on August 4, 2005.

<u>Analysis of Modrovich's Comparison</u>
<u>of His Lawyer's Time to Fisher's</u>

There is a gross disparity between the fees and expenses charged to Fisher and those claimed to have been paid to his own counsel by Modrovich.  This is the dominant theme of Modrovich's opposition and, indeed, the asserted disparity is dramatic.  At the same time, however, the Court is aware from experience that there are often dramatic differences in the requirements to represent well an individual and a large corporation.  In representing Modrovich, one need consult only Modrovich himself, who is the complete repository of the Plaintiff's views on his past relationship with Fisher, how he became involved with Fisher, what Modrovich did with Hunnavix to execute the putative "drag-along" offer, how he did it, why he did it, etc., etc.  A lawyer with a legal assistant, and with a little other help, could readily gain a thorough understanding of Modrovich's view of all issues between him and Fisher and the evidence that Modrovich had to support his view of the case.  On the other hand, Fisher's lawyers had the far more daunting challenge to uncover and to expose Modrovich's manipulative conduct and to peel back the facade of what Modrovich presented as a drag-along offer to reveal the fundamental truth about what was going on.  There is always a heavier burden upon the party having to expose wrongful conduct.  Moreover, there were numerous officers and employees of Fisher who related to Modrovich

13

at one point or another and, in order to understand the entirety of Fisher's conduct, its counsel was required to investigate the memories of many. In these and numerous related aspects, the representation of Fisher would require substantially more staffing, time, and coordination than would the representation of Modrovich.

In addition, Modrovich was a very formidable adversary. He was clever, manipulative and, unfortunately, apparently angry. This was the third Houston lawsuit between Modrovich and Fisher and, on the day that this case was filed in Houston, Modrovich filed the flipside of the same case in California. Fisher's previous resolutions and settlement with Modrovich had lasted but a short time before Modrovich precipitated new conflict that required judicial consideration. When a party finally comes to an understanding that settlements with the adversary are meaningless and that the only way ultimately to obtain one's peace is to prevail in the courts, it guides that party's employment of resources. Hence, a corporate party such as Fisher, when confronted with a Modrovich, will make greater demands upon its attorneys to uncover every fact, to evaluate every situation, to exhaust every legal remedy, to examine every document, to anticipate every possibility, etc. All of this requires far more staffing and a far greater expenditure of hours on behalf of the corporate client than would be required to represent the individual who has little to lose.

14

Also, Modrovich was able to employ counsel with contingency fee arrangements.  For a while he was represented by Ms. Natasha Roit, who had a 40% contingency fee agreement on Modrovich's individual claims.  Later, he was represented by Mr. Robert Steele, who Modrovich vaguely indicated was employed on a combination of contingency fee and by the hour.  Modrovich and his alter ego Hunnavix have not produced any fee agreements that they have with their present counsel.  The fact that there were some contingency fee arrangements, however, leads the Court to give less weight to the hours claimed to have been worked by Modrovich's lawyers. Lawyers on contingency fee agreements are famously more relaxed about reporting hours worked if, indeed, they keep any record at all.  This is not to suggest that Mr. Steele did not keep records; the Court accepts his statement with respect to that, but the evident contingency fee arrangement diminishes the weight to be given to the numbers of hours reported.

Further, Mr. Steele was also representing Modrovich in Modrovich's California litigation against Fisher.  Fisher employed separate California counsel for the California case.  Once again, when the same attorney is representing a client in two lawsuits in two separate states, with both cases essentially involving the same subject matter, fewer hours may be reported on the case in one forum because those hours are being reported on the same subject matter in the same case pending in the other forum.  For example,

15

as previously observed, some 38 depositions were taken in the California case for which Modrovich's attorney presumably charged time on the California case.  Fisher's Texas counsel, however, because of the bearing that information gained in the California case may have on the Texas case, understandably felt it necessary to attend and/or to review the transcripts of those California case depositions, for which he would have billed time to Fisher on the Texas case.  The Court has received no proof of how much was billed to Modrovich on the California case for work that inured to Modrovich's benefit in the Texas case as well.  Of course, certain amounts of time will be distinctly spent in one case or the other as for example, in filing a motion unique to one forum.  With respect to Modrovich's overall investigation and preparation of the case for trial, however, it would seem to make no readily apparent difference as to whether his attorneys' billings were attributed to this case or to the one in California.  The details of all of this have not been supplied to the Court.

In sum, and for many reasons, some of which are suggested above, the numbers of hours that Modrovich's lawyers claim to have worked on this case, while of some value to the Court's analysis, are not in and of themselves a reliable comparison and certainly are not determinative of the hours that were reasonable and necessary for Fisher's lawyers to expend to complete the activities

16

required for them to prosecute Fisher's action and defend the many counterclaims successfully.

<u>Analysis of Fisher's Claims</u>

All of that having been said about the deficiencies of Modrovich's comparative approach to what would be reasonable and necessary for Fisher, the Court after a review of all the evidence to which it applies its own knowledge, experience, and expertise, finds that a report of more than 16,000 hours worked on this case, and legal fees of $4,183,215, are excessive and were not in their entirety necessary for the successful prosecution of Fisher's case and defense of Modrovich's counterclaims. This is not to criticize Fisher or its counsel. Fisher--because of its great distrust of Modrovich and its intense desire to salvage an investment of approximately $30 million--may have welcomed or even required larger than usual numbers of lawyers to work on this case notwithstanding all of the duplication of effort and redundancy that necessarily accompanies such. Indeed, Fisher may have regarded its legal fees and expenses as being of minimal concern vis-a-vis its seemingly endless struggle with Ivan Modrovich. In a case such as this, a party sometimes insists on more staffing than is necessary in order to safeguard against any unforeseen or unexpected development that might arise. The question before the Court, however, is what was *reasonable* and *necessary* for

17

prosecution of the case in order to apply the fee shifting clause of the Shareholders' Agreement and California law.

To begin with, the numbers of Fisher's hours are excessive because too many lawyers and other billing personnel were assigned to work on the case. The core team consisted of eight lawyers, plus three legal assistants, with a supporting cast that brought the number up to 49 persons who entered billable time. In this Judge's experience as a trial lawyer, staffing a case with that many persons, or a core team with as many as eight lawyers, occurred only in the handling of the largest and most complex of cases, not in a contract dispute of this size. For example, in a hostile tender offer securities case, where a major national corporation was resisting its take-over by another major national corporation, I assembled a core team and additional professionals as large as that used by Fisher in this case. In a hostile tender offer, however, the client typically sees not only the life of the company imperiled, but also the jobs of thousands of its employees. Truly massive document productions take place and multiple oral depositions are taken, usually on two tracks, during an intense period of pretrial discovery usually packed into a period of a couple of months or so. Moreover, many of the lawyers on the team in these kinds of cases are securities and transactional lawyers who are simultaneously working to achieve a business solution for the company in play, such as by enticing a "white knight" to make

18

a more favorable offer for the company.  Some other types of cases sometimes require the kind of staffing that Fisher used on this contract dispute, such as certain class actions, complex cases with massive document productions (far greater than that which was required here) and dozens of witnesses, "bet-the-company" suits, and the like.  This contract dispute with Modrovich, however, was capable of being staffed fully and effectively with a core team of approximately one-half the size that was used.

Overstaffing inevitably leads to enormous duplication of effort, as everyone on the team immerses himself and herself in the total case.  The time records of Fisher's counsel reflect hundreds of entries regarding meetings between and among Fisher's attorneys themselves, together with preparations for such meetings.  Likewise, there are hundreds of entries for time spent by numbers of lawyers "reviewing documents."  Meetings and document reviews are essential, but they did not require in this case as many people as were employed.  Fisher would have as many as three of its attorneys travel from Houston to California for each deposition taken in California, when one or two attorneys would have been ample.  Likewise, the Court observed that Fisher on occasion would have three or more attorneys in the courtroom just for docket call, while Modrovich had but one.  In short, and well understanding what was involved in this lawsuit, and also having an appropriate recognition of Fisher's need to be amply staffed, the Court finds

19

that the total staffing and time reported by Fisher's counsel on this case were excessive and were not necessary in their entirety to complete successfully the activities required.  This leads, then, to a judgment of how to trim the excesses and how to determine the appropriate lodestar for application of the contract's fee shifting clause and California law.

## Determining the Lodestar

This Court has a thorough acquaintance with the factual and legal issues in the case and is well acquainted with the fractious history of the parties.  This Court ruled on all of the dispositive motions (as well as many other motions) in a series of three different Memoranda and Orders totaling in all some 85 pages, conducted a five-days trial, wrote 32 pages of Findings of Fact and Conclusions of Law, and presided over several hearings.  In addition, the Court has carefully considered the parties' lengthy submissions on attorneys' fees and expenses, including the several conflicting opinions of respected experts, and has evaluated the evidence and the arguments in the light of the Court's "knowledge, experience, and expertise" acquired in 30 years of trial experience before becoming a judge.  It is in this context that the Court reaches its opinions on a fair and reasonable lodestar for Fisher's fees to be shifted to Modrovich, and for Fisher's expenses.

20

Convinced that two heads are better than one, it is reasonable and necessary that the core team be led by one senior partner experienced in business litigation, along with a junior or mid-level partner also with litigation experience.  The lead counsel could have been either Mr. Collier or Mr. Kruse, but it was unnecessarily duplicative to employ two such senior lawyers on this one case.  The junior or mid-level partner could have been Mr. Bouthillette or Mr. Tipton, but it was duplicative to employ both. In addition to two partners, it is reasonable and necessary on a case of this size and importance to obtain the assistance of two associates with at least one of these associates having had some litigation experience.  Employment of four associates--Mr. Doran, Ms. Pector, Mr. Waller, and Ms. Searle--was unnecessarily duplicative.   Finally, one or two legal assistants would be reasonably required; the number is not so important because litigation legal assistants can substitute in and out of cases with a minimum of duplicated effort so long as there is one who is conversant with the documents and whatever retrieval system is used.   An effective core team will from time to time need additional advice, support, and assistance from other lawyers specializing in particular subjects that may arise.  Fisher's claim here, however, for 1,457 hours of such incremental "specialty and geographic support" is grossly excessive.

21

The Court finds that in Houston, Texas, in 2003-05, the blended rates that were reasonable and necessary for the core team successfully prosecuting Fisher's case were as follows:

| | |
|---|---|
| Senior partner | $405/hour |
| Junior or mid-level partner | $310/hour |
| Experienced associate | $235/hour |
| Associate | $195/hour |
| Legal assistants | $145/hour |

Excluding time spent on Fisher's securities and civil conspiracy claims that the Court dismissed against Fisher, the reasonable and necessary numbers of hours for completion of the activities reasonably required of Fisher's counsel for prosecution of this case from February, 2003 through trial in July, 2005, applied to those blended rates, are as follows:

| | Hours | Blended Rate | | |
|---|---|---|---|---|
| Senior partner | 2,100 | $405 | = | 850,500 |
| Junior or mid-level partner | 1,750 | $310 | = | 542,500 |
| Experienced Associate | 1,850 | $235 | = | 434,750 |
| Associate | 1,500 | $195 | = | 292,500 |
| Legal assistants | 2,000 | $145 | = | 290,000 |
| Additional/specialty/ geographic support | 300 | $200 | = | 60,000 |
| Reasonable and necessary Lodestar | | | | $2,470,250 |

In the event Modrovich appeals from this Court's Final Judgment and Fisher prevails on the appeal, the Court finds that Fisher will be entitled to reasonable and necessary attorneys' fees and expenses of $75,000 for the appeal.

22

Fisher also claims total litigation expenses of $766,462.81. The Court finds that these fees and expenses incurred in connection with successfully prosecuting Fisher's lawsuit are reasonable and necessary, except for the following modifications: (1) the fee for exemplification and copies of papers is reduced by one-half, in part because fewer copies are required when the core team is properly sized and, in addition, there is not a sufficient explanation for why so much copying was required in what was not a document intensive case of major proportions; (2) $14,713.96 in postage fees are deleted, the Court being of the opinion that postage is an ordinary cost of doing business that a law firm should absorb in connection with its overhead; (3) travel expenses are reduced by approximately two-thirds, because the Court finds that first class air travel for Fisher's lawyers, and bookings at top of the line hotels, transportation to the airport by limousine, and the like, while perhaps beneficial to Fisher and its lawyers and worth the expense to Fisher, was not necessary for completion of the activities and the successful prosecution of Fisher's lawsuit. Fewer lawyers traveling, the use of coach fares, and standard good quality hotels are all that is reasonable and necessary in assessing expenses for purposes of applying the fee shifting clause of the Shareholders' Agreement; (4) the "other expenses" category for "certain witness fees, IT services for trial, and overtime charges for non-lawyers," is deleted because it

23

is vague and lumped together without itemization.  (Other items, such as facsimile and long distance expenses for $2,825, were identified even though they involved far lesser amounts.) Accordingly, the Court finds that the necessary and reasonable expenses incurred by Fisher for purposes of the fee shifting clause total $497,790.

For the foregoing reasons, it is

ORDERED that Plaintiffs Fisher Scientific International, Inc. and Fisher Scientific Company, L.L.C., shall have and recover from Defendant Ivan Modrovich reasonable and necessary attorneys' fees incurred in the successful prosecution of this cause of action in the amount of $2,470,250.00, and expenses in the amount of $497,790.00, for a total judgment of $2,968,040.00; and if Modrovich appeals the Final Judgment and Fisher prevails on the appeal, then Fisher shall have and recover from Defendant Ivan Modrovich an additional award of $75,000 for reasonable attorneys' fees and expenses incurred in defending the appeal.

The Clerk shall notify all parties and provide them with a true copy of this Order.

SIGNED at Houston, Texas on this 8th day of December, 2005.

_Ewing Werlein, Jr._

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

24